# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

_____
)
RICKY NELSON, on behalf of himself )
and all others similarly situated, )
)
      Plaintiff, )
)
v. )   CIVIL ACTION NO. _____
)
CONDUENT BUSINESS SERVICES, )
LLC d/b/a EPPICARD, COMERICA, )
INC., and COMERICA BANK, )
)   **JURY TRIAL DEMANDED**
      Defendants. )
_____ )

## CLASS ACTION COMPLAINT

Plaintiff, through undersigned counsel, on behalf of himself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to other allegations.

## PARTIES

1.    Plaintiff Ricky Nelson ("Plaintiff" or "Mr. Nelson") is a citizen of Georgia. Mr. Nelson is sometimes a recipient of temporary unemployment benefits from the Georgia Department of Labor, which are provided to him through his Georgia Unemployment Insurance (UI) Way2Go Debit MasterCard®, which is operated by Conduent Business Services, LLC and issued by Comerica Bank.

2.      Defendant Conduent Business Services, LLC ("Conduent") is a limited liability company organized under the laws of Delaware, with its principal place of business located at 2828 N. Haskell Avenue, Building 1, Floor 9, Dallas, Texas 75204.  It is registered to do business with the Georgia Secretary of State and can be served via its registered agent, Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

3.      Conduent uses various trademarks such as EPPICard®, Way2Go Card®, and GO Program® (collectively "EPPICard") to administer various state benefit programs across the country.

4.      Defendant Comerica, Inc. is an entity incorporated under the laws of Delaware, with its principal place of business located at Comerica Bank Tower, 1717 Main Street, Dallas, Texas 75201.

5.      Comerica is a financial services company that serves millions of customers nationwide.  Comerica is publicly traded on the New York Stock Exchange under the ticker symbol "CMA."  According to a recent Form 10-K filed with the Securities and Exchange Commission, as of December 31, 2015, Comerica was among the 25 largest commercial bank holding companies in the United States.

6.     Comerica Bank offers a broad array of retail, small business, and commercial banking products.

7.     Defendant Comerica Bank is chartered by the State of Texas.  It is registered to do business with the Georgia Secretary of State and can be served via its registered agent, Corporate Creations Network, Inc., at 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30066.  Defendants Comerica Bank and Comerica, Inc. are collectively referred to hereinafter as "Comerica."

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Jurisdiction is also proper pursuant to the Class Action Fairness Act (28 U.S.C. § 1332(d)) because the claims of the proposed class when aggregated together exceed $5,000,000 and some putative class members are residents of different states than Defendants.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Conduent and Comerica are registered to do business in Georgia and do business in this District.  Indeed, Conduent and Comerica administer various state assistance programs in Georgia.  Thus Defendants have substantial business operations within the Northern District.

3

## COMMON FACTUAL ALLEGATIONS

10.    Mr. Nelson has a full-time job with a manufacturing company.  When there is a work stoppage or slow-down associated with his manufacturing job, Mr. Nelson is entitled to receive temporary unemployment benefits from the Georgia Department of Labor.

11.    Historically, benefit recipients like Mr. Nelson would receive their payments from the State of Georgia through a paper checks that were issued by the appropriate agency.

12.    In 2012, however, the State of Georgia decided to stop issuing paper checks to benefit recipients and elected to have a private company issue MasterCard-branded debit cards to benefit recipients like Mr. Nelson.

13.    Mr. Nelson, like any other benefit recipient who was receiving payments via paper check, was automatically enrolled in the new debit card program.

14.    Now, when the Georgia Department of Labor issues unemployment payments, they are posted to Mr. Nelson's debit card account for his use.

15.    The debit cards issued in accordance with the program are referred to as EPPICards.  Cardholders like Mr. Nelson can access information regarding their accounts online.

16.    The State of Georgia was not alone in its decision to cease issuing paper checks for recipients of unemployment benefits, TANF recipients, or child support beneficiaries and instead retain Conduent and Comerica to issue debit cards using the EPPICard®, Way2Go Card®, and GO Program® marks.

17.    Over 20 states across the country have switched to debit cards programs using the EPPICard®, Way2Go Card®, and GO Program® marks to deliver unemployment and child support benefits.

18.    Conduent and Comerica administer the EPPICard®, Way2Go Card®, and GO Program® debit card programs for the State of Georgia and at least a dozen other states, including but not limited to Alabama, Florida, Illinois, Mississippi, New Jersey, New York, Ohio, and Pennsylvania.

19.    When a benefit recipient like Mr. Nelson receives their debit card, Conduent and Comerica allegedly provide them with a Comerica Bank Debit MasterCard Card Terms of Use that ostensibly outlines the terms and conditions that govern use of the debit card.  A representative copy of the Terms of Use issued by Conduent and/or Comerica is attached hereto as Exhibit A.

20.    It is probable that discovery will show that additional versions of the Terms of Use exist, and were perhaps effective during other portions of the likely

class period.  Thus, Exhibit A hereto is not offered as the definitive contract for all relevant class members or time periods.

21.    The standardized Terms of Use were presented to Mr. Nelson and other benefit recipients on a "take it or leave it" basis, and card holders are often not informed that they have any other option to receive their funds.  The form contract was drafted and imposed by Conduent and/or Comerica, which is the party of vastly superior bargaining strength.  The Terms of Use is an agreement of adhesion.

22.    The Terms of Use contain detailed procedures of what a cardholder is supposed to do if they believe their debit card has been lost or stolen or that someone has unlawfully transferred money from their debit card.  <u>See</u> Exhibit A, ¶ 8.

23.    For example, the Terms of Use advise card users as follows:

> Lost or Stolen Card/PIN.  If you believe your Card or PIN has been lost or stolen or that someone has transferred or may transfer money from your available funds without your permission, call us at 1-888-929-2460, or write to us at Customer Account Services, P.O. Box 245997, San Antonio, Texas 78224-5997 with details.

<u>See</u> Exhibit A, ¶ 8.

24.    The Terms of Use also advise card users that in the case of errors or questions about their transactions the following shall apply:

If you think an error has occurred in connection with your Card, call us at 1-888-929-2460 or write us at the address described above as soon as you can.  We must hear from you no later than 60 days after you learn of the error.  You will need to tell us:

(1.) Your name, address, telephone number and Card number.
(2.) Why you believe there is an error, and the dollar amount involved.
(3.) Approximately when the error took place.

If the error cannot be resolved over the phone, we will mail you a Request for Investigation form to complete and return.  You must return the form within 10 business days to Customer Account Services, P.O. Box 245997, San Antonio, Texas 78224-5997.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly.  If we need more time, however, we may take up to 45 days to investigate your complaint or question.  If we decide to do this, we will credit your Card within 10 business days (20 business days for new card accounts after the first deposit is made to the Card) for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.  If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your Card.  For errors involving new Cards, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question.

We will tell you the results within three business days after completing our investigation.  If we decide that there was no error, we will send you a written explanation.  You may ask for copies of the documents that we used in our investigation.

If you need more information about our error-resolution procedures, call us toll-free at 1-888-929-2460.

<u>See</u> Exhibit A, ¶ 10.

25.     The Terms of Use also inform cardholders the following regarding their liability with respect to fraudulent or unauthorized transactions on their accounts:

> Tell us AT ONCE if you believe your Card or PIN has been lost or stolen. Telephoning is the best way of keeping your possible losses down. You could lose all the money associated with your Card.  If you tell us within two business days, you can lose no more than $50 if someone used your Card or PIN without your permission.  If you do NOT tell us within two business days after you learn of the loss or theft of your Card or PIN, and we can prove that we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500.  [Note: You will not be liable for the $50 or $500 amounts stated above for transactions where your PIN is not used to verify your identity if you have not reported two or more incidents of unauthorized use in the immediately preceding 12 months, your Card is in good standing, and you have exercised reasonable care in safeguarding your Card from risk of loss or theft.]  Also, if the written transaction history or other Card transaction information provided to you shows transfers that you did not make, tell us at once.  If you do not tell us within 60 days after the transmittal of such information, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time.  If a good reason (such as a long trip or a hospital stay) kept you from notifying us, we will extend the time periods.  We will cancel your Card if it is reported to us as lost, stolen or destroyed.  Once your Card is canceled, you will have no liability for further transactions involving the use of the canceled Card.

See Exhibit A, ¶ 11.

26.     Despite the clear language in the Terms of Use with respect to (1) the procedures that cardholders must follow regarding lost or stolen cards and

8

unauthorized activity, and (2) the limitations on a cardholders' liability for fraudulent charges and unauthorized uses, Defendants routinely ignore these contractual obligations in direct violation of the Terms of Use.

27.     Instead of following the procedures outlined in the Terms of Use, Defendants engage in a pattern of conduct that includes sham investigations and improper denial of meritorious claims regarding fraudulent charges and unauthorized uses.

28.     Further, Defendants ignore the limitations of liability language contained in the Terms of Use and leave the users of EPPICard®, Way2Go Card®, and GO Program® debit cards holding the bag on hundreds, thousands, and even tens of thousands of dollars of fraudulent charges and unauthorized uses.

29.     Mr. Nelson's experiences with Defendants illustrate this reality.

30.     Mr. Nelson makes it a practice *not* to use his EPPICard.  Instead, he allows any benefits that he may receive to simply accumulate on his card.

31.     In fact, the EPPICards that have been issued to Mr. Nelson by Defendants are kept in his personal safe and are still attached to the piece of paper that contained the cards when they are mailed out by Defendants.

32.    Mr. Nelson does not receive paper statements from Defendants for his account, opting instead, to check his balance by calling the EPPICard customer service number.

33.    On July 26, 2017, Mr. Nelson called to check the balance in his account and verify that the payments from the Georgia Department of Labor had been credited to his account.

34.    During this telephone call, Mr. Nelson discovered that his account balance was incorrect.

35.    The level two customer service representative that Mr. Nelson talked to read off the activity that had been made on his account.  The charges to Mr. Nelson's account totaled $12,506.63.

36.    Mr. Nelson explained to the representative that he had not used his card to make these unauthorized transactions and that his EPPICard was still in his possession inside his personal safe.

37.    The customer service representative flagged Mr. Nelson's account for fraudulent activity, canceled the card in question and issued a new one, and informed Mr. Nelson that he would be sent the required forms for disputing these charges.

38.     That same day, the EPPICard Fraud Services Department opened an investigation into Mr. Nelson's claim and assigned a tracking number of 1-4068667824 to the investigation.

39.     Mr. Nelson was sent a letter that requested that he complete the enclosed Questionnaire of Fraud in its entirety and return it using the enclosed envelope.

40.     The letter also informed Mr. Nelson that the investigation would be completed within 45 days.

41.     On July 27, 2017, Mr. Nelson contacted the Gwinnett County Police Department to report the fraud that had been committed against his account.

42.     Mr. Nelson informed Officer Howard that unbeknownst to him, between February 18, 2017 and June 5, 2017, an unknown individual or individuals had made $12,506.63 in purchases using his debit card account without his permission.

43.     Mr. Nelson also explained to Officer Howard that he discovered this activity when he called EPPICard on July 26, 2017 to check his account balance, that he had not used his card to make these unauthorized transactions, and that his EPPICard was still in his possession inside his personal safe.

44.     On July 27, 2017, Mr. Nelson also reported the fraud on his account to the MasterCard Assistance Center, since his EPPICard is branded with the MasterCard logo.

45.     MasterCard informed Mr. Nelson that he should follow up with Defendants regarding his situation.

46.      After receiving the Questionnaire of Fraud, Mr. Nelson attempted to complete the form in its entirety.  However, Mr. Nelson was unable to completely finish the form because it asked him to list all of the unauthorized charges.

47.     Therefore, on August 7, 2017, Mr. Nelson again contacted EPPICard and spoke with Connie, who indicated that she would mail Mr. Nelson his statements so he could complete the Questionnaire.

48.     On August, 21, 2017, having not received his account statements, Mr. Nelson again contacted EPPICard and spoke with Grace.  Grace also indicated that she would mail Mr. Nelson his statements so he could complete the Questionnaire.

49.     On August 30, 2017, having still not received his account statements, Mr. Nelson again contacted EPPICard and spoke with Susan.  Susan also indicated that she would mail Mr. Nelson his statements so he could complete the Questionnaire.

50.    On September 8, 2017, while still awaiting receipt of his account statements that he had requested on numerous occasions for the past month, Mr. Nelson received a letter from EPPICard's Fraud Services Department saying that it had completed its investigation and that it could not confirm that any fraud occurred.

51.    After receiving the September 8, 2017 letter, Mr. Nelson again contacted EPPICard and spoke with Connie.   After reviewing the account notes and recalling their previous conversation, Connie provided Mr. Nelson with the following list of transactions over the phone:

| | | |
|---|---|---|
| Money transfer | 2/18/2017 | $9,999.00 |
| PCH-Intellius.com | 2/20/2017 | $0.95 |
| Conekta Recarga | 2/20/2017 | $7.36 |
| Flypay Telcel | 2/23/2017 | $51.99 |
| PCH-Intellius.com | 2/24/2017 | $29.95 |
| Flypay Telcel | 2/28/2017 | $21.40 |
| Google King | 2/28/2017 | $35.16 |
| Ancestry.com | 3/06/2017 | $19.99 |
| Flypay Telcel | 3/06/2017 | $51.99 |
| Google King | 3/08/2017 | $32.42 |
| Netflix.com | 3/08/2017 | $8.19 |
| Google King | 3/09/2017 | $8.61 |
| Tel Cel Services | 3/11/2017 | $41.43 |
| Google King | 3/12/2017 | $14.27 |
| Google King | 3/13/2017 | $0.87 |
| Google King | 3/14/2017 | $0.87 |
| Google King | 3/14/2017 | $8.65 |
| Google King | 3/14/2017 | $8.65 |
| Google King | 3/14/2017 | $0.87 |
| Google King | 3/14/2017 | $0.87 |

| | | |
|---|---|---|
| Google King | 3/14/2017 | $0.87 |
| Google King | 3/14/2017 | $0.87 |
| Google King | 3/14/2017 | $8.65 |
| Google King | 3/14/2017 | $0.87 |
| Google King | 3/14/2017 | $0.87 |
| Google King | 3/14/2017 | $0.87 |
| Google King | 3/14/2017 | $0.87 |
| Transfast Remit LLC | 3/15/2017 | $204.99 |
| Google King | 3/17/2017 | $19.37 |
| Google King | 3/17/2017 | $36.68 |
| Google King | 3/17/2017 | $0.89 |
| Transfast Remit LLC | 3/18/2017 | $204.99 |
| Google King | 3/18/2017 | $0.89 |
| Google King | 3/18/2017 | $0.89 |
| PCH-Intellius.com | 3/20/2017 | $29.95 |
| Google King | 3/20/2017 | $0.89 |
| Transfast Remit LLC | 3/21/2017 | $354.99 |
| PayPal Movical Soft | 3/22/2017 | $16.30 |
| Money Transfer | 3/22/2017 | $1,235.00 |
| Google King | 3/22/2017 | $4.68 |
| PCH-Intellius.com | 4/15/2017 | $1.95 |
| PCH-Intellius.com | 6/05/2017 | $0.95 |

52.    On September 18, 2017, Mr. Nelson sent the Fraud Services Department a letter questioning how they could have completed their investigation when Mr. Nelson had been unable to provide them with any written documentation regarding the fraudulent transactions because EPPICard refused to provide him with copies of his statements despite numerous requests and how the investigation could have been completed without anyone from the Fraud Services Department even contacting him regarding his account.

14

53.    Mr. Nelson's September 18 letter included the list of transactions contained in Paragraph 51, above, and also enclosed a copy of the completed Questionnaire of Fraud.

54.    On September 20, 2017, Mr. Nelson then filed an Identity Theft Report with the Federal Trade Commission.

55.    On the same date, Mr. Nelson also filed reports with the Comptroller of the Currency and the Consumer Financial Protection Bureau regarding the fraudulent activity on his account.

56.    On September 21, 2017, Mr. Nelson called EPPICard to follow up regarding the fraud investigation.  After initially speaking with Olivia, he was transferred to Robin.  Robin took down Mr. Nelson's contact information and transferred him to a supervisor named Jarred.  Jarred advised Mr. Nelson to submit a written request to EPPICard seeking to have his dispute reopened for secondary review.

57.    Per Jarred's instructions, on September 24, 2017, Mr. Nelson sent EPPICard a letter detailing his experiences and requesting that his dispute be reopened for secondary review.

58.    Almost three months later, on December 11, 2017, the EPPICard Fraud Services Department sent Mr. Nelson a letter indicating that while it had

reopened its investigation of his original claim, based on their additional investigation, they could not confirm that fraud occurred and denied Mr. Nelson's claim.

59.     EPPICard's December 11, 2017 letter indicated that Mr. Nelson could request a copy of the documents that they relied upon in making their determination.

60.     Mr. Nelson contacted EPPICard to request a copy of these documents, but just like it did with his account statements, EPPICard failed to provide Mr. Nelson with the requested information.

61.     As of the filing of this Complaint, Defendants still refuse to refund Mr. Nelson the $12,506.63 that was fraudulently removed from his account.

62.     Unfortunately, Mr. Nelson's experiences with Defendants are not isolated.  The website ConsumerAffairs.com has collected hundreds of online complaints from people across the country that detail similar experiences with EPPICard.

63.     Jacqueline, from Seymour, TN, submitted the following complaint on January 12, 2018:

> On December 11, 2017 I called several times trying to reach Customer Service to report 2 charges from Facebook.  One charge was for $25.24 and the other charge was for $25.00.  I finally spoke with someone around 2:30 or 3:00 in the afternoon, explaining that these

charges didn't belong to me.  She said they were fraudulent charges, I said no not fraud, they don't belong to me, I don't do business on Facebook.  Next she said she would have to close my card and issue a new one and I said, "Well wait let me go and get money out. My son is in a wheelchair and has medical issues and needs supplies."  She said, "Too late, I already locked your card, a new one will take 5 to 7 days." I said, "I can't wait that long for $118.+ - I need it now."  So she said she filed a dispute, it will take 45 days.  Christmas around the corner.  As I was thinking about it I went back on my account and noticed all these $.25 and $.50 charges on my account, I called them back and was fuming and got a different lady and she said, "Well didn't you know you can only make 4 calls a month."  I said NO.  I didn't want this card.  They are fighting with me to return my son's money.  For his medical needs and food.

64.    Rena, from San Jose, CA, submitted the following complaint on

November 3, 2017:

I had $200 fraudulently used last month on my card and I called right away and stopped my card, I filled out the paper they sent and right away I was issued $200 credit adjustment so I thought it was solved, couple days later I received another $200 debit reversal, I knew one was a mistake so I didn't touch it, sure enough a few days later it was taken back, after that a few purchases that I did make were credited back to me and then adjusted.

Then yesterday $200 was taken back off my account and upon calling (mind you it's a pain in the ** to try and get through to someone).  So I had to call back 4 times to choose the right option because there was no push start (or whatever) to go back, so I started getting charged for calling too, and speaking to the customer service.  She told me oh that was still the provisional $200 they gave me when the case first opened and it's still open and no determination on my fraud has been made yet and they just randomly decided to take the money back.

I was pissed.  This was the only money I had before my daughter's bday next week and all she kept telling me was "sorry there's nothing

17

I can do." I asked to speak with a supervisor who said the same, just there's nothing I can do. Now they're saying it can take up to another month and a half until the initial claim is determined and I get my money back, which now I'm seriously doubting I will.

I asked the supervisor "what's the point of the provisional credit if you're just going to take it back without the claim even being determined." I want an answer to that and she said "there's nothing I can do" and hung up on me!!! I'm beyond furious!!! Took me 50 minutes even to get someone in the phone and my charges for calling were never reversed either.

65.    Marshayla, from Mesquite, TX, wrote the following on October 11, 2017:

My account was used somehow fraudulently so I filed a claim. I filled out paperwork and mailed it in. The fraud department ruled against me and never contacted me via email, mail or phone call. I'm out $300 and all they recommend is to write a letter. You are better off transferring your money to a REAL financial institution where they treat fraud claims thoroughly and more seriously.

66.    Maria, from Indianapolis, IN, submitted the following on January 25, 2017:

Went to make a purchase & was told my card was declined, I knew my child support money had just been deposited a day before due to notifications that I received by text from Eppicard. When I left the store I immediately checked my acct. online to find that someone in California & Nevada was using my card info to make purchases. I called customer service to notify them that there were 10 transactions on my account that were not mine and that I have my card with me & the customer service rep. said she can only dispute 2 transactions that have cleared & that the other 8 pending transactions I would have to wait till they clear. Now why would they let that happen instead of stopping them from posting?? That made no sense to me.

I had to file a fraud report and still haven't got my money back.  I just don't understand why they let those other charges go through and why it's taking so long for me to get my money, if they know that I live in Indiana & I had the card in my possession & these transactions were made in 2 different states other than the one I live in.  It's now been 1 month since I called and sent the paperwork they asked me to fill out.  We'll see how long it takes for them to resolve this.  I dread calling them as it is so difficult to reach them.  They need a better customer service line.

67.    D. from Milwaukee, WI, submitted the following complaint on

January 8, 2017:

My Eppicard loaded a couple days ago and today, as I attempted to use it it was declined.  I knew that the funds should have been there so I immediately called the card customer service number and was placed on hold for nearly 30 minutes.  It was discovered that my card had been fraudulently used Internationally in Manama and Sanabis (wherever those places may be) totaling over $600.00.  As a matter of fact the rep told me that the charges were "still pending"!  I asked if they could stop the charges from going thru since it was clear that my card (which was issued in Wisconsin) was in my possession and that this was indeed criminal activity going on.  She advised me that she would have to cancel my card and issue me a new card that I would have to pay $5 for!

Furthermore, when asked about returning my funds she explains a process that makes no sense to me.  Call back in 5 days and tell whoever answers that I already canceled my card and need to start an investigation that could take anywhere from 45-90 days to complete!  Why would it take that long when you clearly see that the fraudulent activity is taking place on my card in a foreign country as we are speaking?!!  I need my money now.  This is very strange and I smell a rat within this company.

I agree that it's time for a class action lawsuit because this is unacceptable and many people are depending on these funds to help support children and households. The rep was not helpful at all and I am very upset that this is suppose to be a professional company entrusted with millions of our dollars with seemingly very little accountability on their part. There are far too many similar recent complaints for this matter to go unaddressed.

Something needs to be done about this ASAP so that no one else has to suffer in the days ahead.

68.    EPPICard user, Tazaina, from Cambria Heights, NY, had the

following to say on August 30, 2016 regarding her experiences:

I receive child support payment on a NY State Eppicard. For the last 3 years, I've had no problem with the card other than the fact that I was unable to access funds via a Wells Fargo ATM. I was in the beginning and then all of a sudden (for about the last year) I could not withdraw the money. Days after the child support payment was credited to the account, I would withdraw $500 of the $508 that was deposited into the account. Therefore, there was never a huge amount of money left in the account until the next deposit would hit. But after several ATM attempts over the last, I was forced to use the card at local merchants or to pay an occasional utility bill in order to access funds. This did not pose a huge inconvenience for me but know I realize that because money would sometimes remain in the account for a longer period of time, my account would be more vulnerable to fraudulent activity.

On the evening of July 4th, 2016 I attempted to use my Eppicard at a merchant to purchase groceries, BJ's Wholesale. The attempted charge amount was almost $400 dollars. The card was declined. I thought that it was a little weird being that I had expected that the Child Support payment of $508 was more than enough to clear the charges. Luckily, I had another form of payment and just figured that maybe I was off as to when the deposit hit the account being that this was a holiday weekend. The next day, I attempted to use the card at a

CVS to pay for a prescription at the pharmacy. The amount was less than $10. The charge was again declined. That really alarmed me because I thought to myself, even if the child support money did not hit the account, I should've had enough left over in the account from the previous deposit made (because I never used all of it) to cover the cost.

When I got home later that evening, I logged onto the Eppicard website to check all of the transactions previously made. That's when I discovered the fraudulent charge in the amount of $597.23 (the exact amount left in the account, $508 deposit + what was left over from the previous deposit) made at a Michael Kors store in California for the same day that I was trying to use the card in BJ's in NY (July 4th, 2016). I immediately tried to call Eppicard customer service to report it and to change my card info. to prevent any more fraudulent charges and was on hold for so long (2 hours) that I had to hang up, call customer service again and use the automated prompts just to report the card lost/stolen so that the card could not be used again. When I called customer service again to start a claim of fraud, I was on hold another hour before I was even connected to a representative.

I was given a service request number by the representative and was advised not to wait for the paperwork in the mail, that I should write a letter asking for the investigation to begin. I was also told that if the letter was received within 10 days of me notifying them of the fraudulent charge, that I would receive a provisional credit until the investigation was complete (which could take 45-90 days). I immediately sent out the letter. I waited about a month to call and to find out the status of the investigation (and because I had not received the credit to my account yet). Again, another hour on hold waiting to speak to a representative only to find out that they said they never received a letter. So I sent a second letter, this time with delivery confirmation from the USPS. I sent the letter Aug. 8 and the letter was confirmed delivered on Aug. 11.

I called again, again a long wait (45 min). The representative this time tells me that the case had been closed because the still haven't received anything! I'm sure you can understand my frustration,

especially when I had a receipt of confirmed delivery. I was advised (after cursing and requesting to speak to supervisor) that I should fax the letter to a fax number. So on Aug 23, I faxed it. Called a third time (the day after faxing it), they again say they still haven't received anything! To top it off, I received a letter in the mail dated Aug 19th, that my investigation is closed because they can't determine fraud!

I'm done. They can't mess with my children's money! No one helps, not NY State Child Support, not that bank who issued the card Comerica, not the Eppicard reps. And now I'm reading all of these reviews and complaints with similar complaints.

69.     Darryl, from Fort Washington, MD, submitted the following comment

on November 24, 2015:

I recently filed a claim with the Eppicard Fraud Department who just sent me a letter denying my claim that was clearly fraud. I was recently laid off after 12 years working for a law firm (Patton Boggs LLP). I applied for my unemployment so I can be able to pay my Mortgage. On September 11th I noticed that my $700.00 disappeared off my card. I immediately called the unemployment place and emailed the Director and spoke to someone from Eppicard. The Director for Unemployment called back and told me I did the right thing by calling Eppicard people because they should be able to help me get my funds back. The charges were approximately $64.12 taken off my card over and over the same amount back to back and another amount of $74.00 taken off back to back in the matter of one day. A few charges were stolen on Sept 12th but most of the funds were taken on the 11th.

The lady I first spoke to clearly said it was fraudulent. I called and called but no one seem to really care. I did everything they asked and now they don't want to return my money. I have worked hard for 12 years and I have to keep my bills paid until I find another Job. Could someone please help me to get my funds back. They are denying my claim that was clearly fraud. I have read reviews on this Company and this has been done to several people times and they are not

receiving their funds back after being stolen off their cards.  This has never happen to me with other bank cards just Eppicards.  I need your help to step in and help me get my funds back please.

70.    EPPICard user Tiffany, from Houston, TX, shared the following on

October 15, 2015:

> On August 28, 2015, I made a fraud report to Eppicard because over a course of a month, $406 ($103 in July, $303 on August 28th) was stolen from my card at an ATM in Baltimore, MD.  The problem is I live in Houston, TX and still had the card in my possession.  I followed the necessary procedures of calling and reporting the fraud, completing the documents once received by me in the mail, mailing them back to Eppicard within the allowable 10 days, and then just waiting...
>
> I've contacted them several times regarding this matter, only to be told the case is still under investigation.  I last called on Tuesday, October 13th and was informed the case was "denied, with no further information."  I repeatedly tried to get an explanation as to why the fraud investigation was denied, but was told they "needed more information", although I'd fulfilled all obligations required of me and submitted all documents in a timely fashion.

71.    A recent article from Karin Price Mueller, a reporter who writes a

twice weekly consumer affairs column called Bamboozled for The Star-Ledger,

New Jersey's largest newspaper, outlined similar issues.  See Karin Price Mueller,

"Fraud Complaints Still Plague State Debit Card" (Jan. 22, 2018) (available at

https://karinpricemueller.com/bamboozled-january-22-2018-fraud-complaints-still-

plague-state-debit-card/).

72.    According to Ms. Mueller, she has been hearing consumer complaints about EPPICard since 2009.  Id.

73.    According to Ms. Mueller's investigation, even though the EPPICard is "supposed to have the same kinds of protections as a traditional debit card, consumers have compared resolving fake charges after a card is compromised to running on a hamster wheel."  Id.

74.    Ms. Mueller has fielded complaints regarding EPPICard from Florida, Illinois, Wisconsin, Connecticut, Georgia, and Texas that chronicle the following issues: EPPICard losing fraud paperwork multiple times; EPPICard wrongly and repeatedly telling consumers they need to pursue the phony charges with the merchant; and EPPICard issuing provisional credits only to reverse the credits and reinstate the charges even when the charges were made in foreign countries or in states far from the cardholder.  Id.

75.    Mr. Nelson's experiences and the others outlined above demonstrate that Defendants systematically refuse to provide refunds to EPPICard users who experience fraud on their accounts.

76.    Defendants' refusal to provide these refunds saves them millions of dollars each year and wrongfully deprives their customers of funds that rightfully belong to them.

## CLASS ALLEGATIONS

77.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rule 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

78.     The proposed class is defined as:

> All Conduent and Comerica EPPICard®, Way2Go Card®, and GO Program® customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred fraudulent charges on their accounts and were denied a refund of such charges in violation of Defendants' Terms of Use (the "Class").

79.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.   In addition, subclasses will likely be sought for those victims of Defendants' practices who reside in certain states where statutory protections, such as fair business practices statutes, have been violated by Defendants.

80.     Excluded from the Class are Conduent, Comerica, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Conduent and/or Comerica have a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

81.     The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members whose identity is within the knowledge of Conduent and Comerica and can be ascertained only by reviewing the records of Conduent and Comerica.

82.     The claims of the representative Plaintiff are typical of the claims of the Class in that Mr. Nelson, like all Class members, lost funds based on the improper practices described herein.  The representative Plaintiff, like all Class members, has been damaged by the misconduct of Conduent and Comerica. Furthermore, the factual basis of Defendants' misconduct is common to all Class members, and represents a common thread of conduct resulting in injury to all members of the Class.

83.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

84.     Among the questions of law and fact common to the Class are whether Defendants:

      a.     Violate the express language of the Terms of Use;

      b.     Breach the covenant of good faith and fair dealing through their practices;

c.    Require their customers to enter into standardized account agreements which include unconscionable provisions;

d.    Convert moneys belonging to Plaintiff and other members of the Class through their practices; and

e.    Are unjustly enriched through their retention of monies that rightfully belong to the Class.

85.    Other questions of law and fact common to the Class include:

a.    The proper method or methods by which to measure damages, and

b.    The declaratory relief to which the Class is entitled.

86.    Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful policies and practices and the same or substantially similar unconscionable provisions of Defendants' contractual agreements and other related documents.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

87.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions.

Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

88.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Conduent and Comerica, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy.

89.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF

### Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing

90.    Plaintiff repeats paragraphs 1 through 89 above.

91.    Plaintiff and Defendants have contracted for services, as embodied in Comerica's Terms of Use and related documentation.

92.    Defendants violated the contract by failing to adhere to the policies and procedures contained in the contract with respect to fraudulent and unauthorized transactions.  Thus, Defendants have materially breached the express terms of their own form contract.

93.    Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by Defendants.

94.    Plaintiff and members of the Class sustained damages as a result of Defendants' breaches of the contracts.

95.    Under the laws of the states at issue, good faith is an element of every contract.  Whether by common law or statute, contracts include the obligation that all parties act in good faith and deal fairly with the other parties.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely

the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms are examples of a lack of good faith in the performance of a contract.

96.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Defendants have breached the covenant of good faith and fair dealing through their policies and practices as alleged herein.

97.     Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the Terms of Use.

98.     Plaintiff and members of the Class have sustained damages as a result of Defendants' breach of the covenant of good faith and fair dealing.  Whether based on direct breaches of the contract, or violations of the contract as a result of the covenant of good faith and fair dealing, or both, Defendants should be required to make Plaintiff and the Class whole.

## SECOND CLAIM FOR RELIEF

### Conversion

99.     Plaintiff repeats paragraphs 1 through 89 above.

100.    Defendants have and continue to have a duty to maintain and preserve their customers' EPPICard accounts and to prevent their diminishment through their own wrongful acts.

101.    Defendants have allowed funds to be wrongfully withdrawn from the accounts of Plaintiff and the members of the Class and have refused to replace these specific and readily identifiable funds from their accounts even though they were removed fraudulently.

102.    Defendants have, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

103.    Defendants continue to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

104.    Defendants intend to permanently deprive Plaintiff and the members of the Class of these funds.

105.    These funds are properly owned by Plaintiff and the members of the Class, not Defendants, which now claim that they are entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

106.    Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

107.    Defendants have wrongfully converted these specific and readily identifiable funds.

108.    Defendants' wrongful conduct is continuing.

109.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

110.    By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from Defendants all damages and costs permitted by law, including all amounts that Defendants have wrongfully converted.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

111.   Plaintiff repeats paragraphs 1 through 98 above.

112.   Plaintiff, on behalf of himself and the Class, asserts a common law claim for unjust enrichment.  This claim is brought solely in the alternative to the First Claim for Relief (breach of contract) and Plaintiff concedes that this claim cannot survive if his contractual claims succeed.  If, however, all or portions of Defendants' contracts are deemed unconscionable or otherwise unenforceable for any reason, unjust enrichment will dictate that Defendants disgorge all improperly retained amounts.

113.   By means of Defendants' wrongful conduct alleged herein, Defendants knowingly retained funds from Plaintiff and members of the Class that should not have been retained.

114.   In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and members of the Class.

115.   As a result of Defendants' wrongful conduct as alleged herein, they have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

116.   Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

117.   Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of improper fees on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

118.   The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Class.  Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all

wrongful or inequitable proceeds.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiff and the members of the Class.

119.   Plaintiff and members of the Class have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

### Declaratory Relief

120.   Plaintiff repeats paragraphs 1 through 89 above.

121.   Class-wide declaratory relief is appropriate where a defendant has "acted or refused to act on grounds that apply generally to the class."

122.   Defendants have attempted to immunize themselves from liability for their practices by burying provisions in the adhesive Terms of Use that purport to make it as difficult, dangerous, and costly as possible for Plaintiff and members of the Class to obtain relief from Defendants' improper conduct.  Such clauses include but are not limited to those which purport to:

a.      give Defendants the right "change (add to, delete or amend) these Terms at any time" for any reason, or no reason at all (Terms of Use, ¶ 22);

b.      limit the statute of limitations for obtaining legal relief for Defendants' wrongful conduct to 12 months (id. at ¶ 13); and

c.     require legal disputes to be governed by and construed in accordance with "the laws of the State of Michigan" (id. at ¶ 20) even though the State of Michigan has absolutely no interest in this dispute, including because Defendants are located in Texas, Defendants do not provide EPPICard services in Michigan, and Plaintiff and the members of the Class are not citizens of Michigan.

123.   Such provisions should be deemed unenforceable on multiple grounds, including because they are exculpatory, illusory, lack mutuality, and violate public policy.

124.   Moreover, considering the great business acumen and experience of Defendants in relation to Plaintiff and the members of the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

125.   Thus, a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

126.   The Court should use its equitable and declaratory powers to declare certain contractual provisions to be unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment which includes the following:

1.      Certification of the Class under Rule 23;

2.      Restitution of all monies lost by Plaintiff and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by Defendants from their misconduct;

4.      Actual damages in an amount proven at trial;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Reimbursement of all fees, expenses, and costs of Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

DATED this 14th day of February, 2018.

        Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

   */s/ E. Adam Webb*
   E. Adam Webb
    Georgia Bar No. 743910
   G. Franklin Lemond, Jr.
    Georgia Bar No. 141315

   1900 The Exchange, S.E.
   Suite 480
   Atlanta, Georgia 30339
   (770) 444-9325
   (770) 217-9950 (fax)
   Adam@WebbLLC.com
   Franklin@WebbLLC.com

   *Attorneys for Plaintiff*

Exhibit "A"

# Comerica Debit MasterCard® Card Terms of Use

The State has made arrangements for a Card to be issued to you so that you can receive payments electronically. Comerica Bank ("we", "us" and "Bank") is providing you with these terms ("Terms") and the enclosed Georgia UI Debit MasterCard ("Card") because you have agreed with the State of Georgia, Department of Labor (the "State") to accept payments that you are eligible to receive by means of the Card. This agreement describes your rights and obligations with respect to the Card. If you have questions, wish to discuss your options, or do not agree with these Terms, you must contact your Agency or local office processing your payments and do not activate the Card. You can destroy it by cutting it in half.

YOU CANNOT USE THE ENCLOSED CARD TO PERFORM TRANSACTIONS UNTIL YOU HAVE SELECTED YOUR PERSONAL IDENTIFICATION NUMBER (PIN), WHICH WILL ALSO ACTIVATE THE CARD.

By selecting your PIN and activating the Card in accordance with the instructions accompanying this form, you will be agreeing to abide by these Terms. Your use of the Card will further attest to your agreement to abide by these Terms.

1. **Payments to You.** A Card account has been established with us to fund payments to you. We will make funds available to you in the amounts designated by the State, and you will be able to access those funds with the Card. Funds that the State has provided to us to be applied to your Card may be returned to the State if: (a) you fail to activate your Card by selecting your PIN within 90 days from the date the Card was issued; (b) we do not have your correct address and are unable to deliver your Card by regular mail; or (c) funds are deposited to your Card in error.

2. **Personal Identification Number (PIN).** The Card cannot be used at automated teller machines ("ATMs") and some point-of-sale ("POS") terminals without the PIN. You may be asked to sign a sales slip or provide identification, rather than enter your PIN, for certain POS transactions. At some merchants, such as gas stations, you may not be required to sign your name or enter your PIN.

3. **Card Transactions.** You can use the Card to obtain cash at ATMs and financial institutions, and to make purchases at POS terminals and merchants, that participate in the MasterCard® network. When you use the Card to initiate a transaction at certain merchants, such as hotels, a hold may be placed on your available Card funds for an amount equal to or in excess of your ultimate transaction. The held funds will not be available to you for any other purpose. Any excess will be released for your use when the transaction is finally settled.

   Cash refunds will not be made to you for POS purchases. If a merchant gives you a credit for merchandise returns or adjustments, it may do so by processing a credit adjustment, which we will apply as a credit to your Card.

   We may refuse to authorize a Card transaction if: (a) it would exceed the amount that the State has advised us to make available for your use; (b) the Card is reported lost or stolen; (c) we believe the Card is counterfeit; or (d) we are uncertain whether the transaction is authorized by you or permitted by law. We may temporarily "freeze" the Card and attempt to contact you if we note transactions that are unusual or appear suspicious.

   You may not use the Card to perform transactions that exceed the amount of funds made available to you through this program by the State. There may be occasions when deposits are posted to your card in error, or funds added that do not belong to you. You are not authorized to spend these funds because the State has not authorized us to make these funds available through the Card. In such events, this error will be corrected once discovered and funds will be adjusted in your card. Should the adjustment result in your card becoming negative, a notice letter will be sent to you explaining the error and the reason for the adjustment. If you have spent the funds before the error is identified, the amount to be repaid may be automatically deducted from future payments to your card as described in Section 9 of this document. Your Card must not be used for any unlawful purpose (for example, to facilitate Internet gambling). You agree not to use your Card or funds for any transaction that is illegal. We reserve the right to deny transactions or authorizations from merchants apparently engaging in the Internet gambling business or identifying themselves through transaction records or otherwise as engaged in such business. You also may experience difficulties using the Card at: unattended vending machines and kiosks; gas station pumps (you may go inside to pay).

   Preauthorized Payments. You may use your Card to make regular, preauthorized payments to merchants by giving your Card information to a merchant. If these payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

   You have the right to cancel a pre-authorized payment from your Card if you call us at 1-888-929-2460 or write to us at Customer Account Services, P.O. Box 245997, San Antonio, Texas 78224-5997. We must receive your request at least three business days before the payment is scheduled to be made. You also must notify the payee. (Note: If we do not receive your request at least three business days before the scheduled payment, we may attempt, at our sole

discretion, to stop the payment. However, we assume no responsibility for our failure or refusal to do so, even if we accept your stop payment request). If you call, we may require you to put your request in writing to us and to provide us with a copy of your notice to the payee, revoking the payee's authority to originate debits to your Card, within 14 days after you call. If we do not receive the written confirmation within 14 days, we may honor subsequent debits to your Card. For individual payments, please specify the exact amount (dollars and cents) of the transfer you want to stop, the date of the transfer, and the identity of the payee. Unless you tell us that all future transfers to a specific recipient are to stop, we may honor later stop pay payment order as a request concerning the one transfer only. If you order us to stop one of these payments at least three business days before the transfer is scheduled and we do not do so, we will be liable for your losses or damages.

4. **Card and PIN Security.** You agree not to give or otherwise make the Card or PIN available to others. For security reasons, you agree not to write your PIN on the Card or keep it in the same location as the Card. The Card is our property and must be returned to us upon request.

5. **Fees.** You are allowed unlimited free Card ATM cash withdrawals but only if conducted at "in-network" (i.e., MoneyPass) ATMs. A fee of $0.95 will be assessed for each ATM cash withdrawal conducted at an ATM that is not in-network and for each ATM withdrawal conducted outside of the United States. An additional fee equal to 3% of the amount of the transaction will be charged for each international ATM withdrawal.

   You are allowed unlimited ATM balance inquiries each month at in-network MoneyPass ATMs. There is not charge for ATM denials for insufficient funds. A denial occurs when there are not sufficient funds available to cover your cash withdrawal request.

   If you conduct a transaction at an ATM other than MoneyPass the owner of the ATM may impose an additional fee called a "surcharge." Read the screen message carefully for information related to surcharges before you press "Enter." You will have the option to cancel the transaction and go to another ATM.

   After receipt of your initial Card, you may receive one free Card replacement each 12-month period. A $4.50 fee will be charged for each additional Card replacement; plus an additional $14.50 if you request that the replacement Card be sent express two day delivery (business days only) rather than by regular mail.

   Additional services: There is no fee to sign up for deposit notification, low balance alert and/or instant mobile alert via email, phone or text message. If you sign up for instant mobile alerts, you are allowed one free mobile text alert with each deposit each month; after the one free mobile alert is sent, your Card account will be charge $0.10 for each additional alert. If you use online bill pay using the website www.goprogram.com, your Card account is assessed a fee of $0.50 for each transaction. If you wish to transfer funds from your debit card to a consumer bank account in the USA, a fee of $1.50 will be assessed.

   Card account inactive fee: Card inactivity fee; after 12 consecutive months of inactivity, we will assess a $1.75 fee per month, beginning in the 13th month of each consecutive month of inactivity, thereafter. Inactivity is defined as no deposits, cash withdrawals, balance inquiries or purchases for 12 consecutive months.

   You can make unlimited free calls to Customer Service Interactive Voice Response (IVR) or live operator for Card account services and other card related services. There is no is cost to access your Card account balance via the web or to request a printed monthly statement be mailed to you.

6. **Foreign Currency Transactions.** If you obtain cash or perform an ATM or POS transaction in a currency other than U.S. dollars, the merchant or MasterCard® International will convert the amount of the transaction into U.S. dollars to be charged to your Card. Under the currency conversion procedure that MasterCard® International uses, the non-U.S. dollar transaction amount is multiplied by a currency conversion rate to determine its equivalent in U.S. dollars. The currency conversion rate that MasterCard® International typically uses is either a government-mandated rate, or a rate selected from a range of rates available in the wholesale currency markets (NOTE: this rate may be different from the rate MasterCard® International itself receives). The conversion rate may be different from the rate in effect on the date of your transaction and the date it is posted to your Card.

7. **Record of Your Available Funds and Transactions.** You can get a receipt at the time you perform a transaction at an ATM or POS terminal. You may obtain information about the amount of funds available through the Card and your last 10 transactions by calling the Customer Service Center toll free at 1-888-929-2460 or by visiting www.goprogram.com. From the web site you can select and print monthly statements for tracking the transactions posted to your Card. The amount of your available funds is also available on the receipt you get when you make a withdrawal or balance inquiry at certain ATMs. You also have the right to receive a written summary of transactions for the 60 days preceding your request by calling us at 1-888-929-2460.

8. **Lost or Stolen Card/Pin.** If you believe the Card or PIN has been lost or stolen or that someone has transferred or may transfer money from your Card without your permission, call us at 1-888-929-2460, or write to us at

Customer Account Services, P.O. Box 245997, San Antonio, Texas 78224-5997 with details.

9. **Adjustments to Your Card Balance.** There are occasions when adjustments will be made to your card to reflect a merchant adjustment, resolve a cardholder dispute regarding a transaction posted to your card, or to adjust entries or deposits posted in error. These processing entries could cause your card to have a negative balance. If so, you agree to repay us the amount of any transaction(s) that exceed the authorized amount or causes your card balance to go negative, either from future deposits posted to your card or by personal check or money order. Unless paid by personal check or money order, the amount to be repaid may be automatically deducted from future payments to your card. If no future deposits are made to your card, you must satisfy a negative balance by making payment to: ACS Payment Processing Service, and mail a check or money order to: Customer Account Services, P.O. Box 245997, San Antonio, Texas 78224-5997. Remember, you always have the right to dispute the amount posted.

10. **In Case of Errors or Questions About Your Transactions.** If you think an error has occurred in connection with your Card, call us at 1-888-929-2460 or write us at the address described above as soon as you can. We must hear from you no later than 60 days after you learn of the error. You will need to tell us:

    (1.) Your name, address, telephone number and Card number.
    (2.) Why you believe there is an error, and the dollar amount involved.
    (3.) Approximately when the error took place.

    If the error cannot be resolved over the phone, we will mail you a Request for Investigation form to complete and return. You must return the form within 10 business days to Customer Account Services, P.O. Box 245997, San Antonio, Texas 78224-5997.

    We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Card within 10 business days (20 business days for new card accounts after the first deposit is made to the Card) for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your Card. For errors involving new Cards, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question.

    We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

    If you need more information about our error-resolution procedures, call us toll-free at 1-888-929-2460.

11. **Your Liability.** Tell us AT ONCE if you believe your Card or PIN has been lost or stolen. Telephoning is the best way of keeping your possible losses down. You could lose all the money associated with your Card. If you tell us within two business days, you can lose no more than $50 if someone used your Card or PIN without your permission. If you do NOT tell us within two business days after you learn of the loss or theft of your Card or PIN, and we can prove that we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500.

    [Note: You will not be liable for the $50 or $500 amounts stated above for transactions where your PIN is not used to verify your identity if you have not reported two or more incidents of unauthorized use in the immediately preceding 12 months, your Card is in good standing, and you have exercised reasonable care in safeguarding your Card from risk of loss or theft.]

    Also, if the written transaction history or other Card transaction information provided to you shows transfers that you did not make, tell us at once. If you do not tell us within 60 days after the transmittal of such information, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from notifying us, we will extend the time periods.

    We will cancel your Card if it is reported to us as lost, stolen or destroyed. Once your Card is canceled, you will have no liability for further transactions involving the use of the canceled Card.

12. **Our Liability.** If we do not complete an electronic fund transfer to or from the Card on time or in the correct amount according to these Terms, we may be liable for your losses or damages. There are some exceptions, however. We will not be liable, for instance, if:

    • Through no fault of ours, you do not have enough available funds on the Card to perform the transaction;
    • Circumstances beyond our control (such as fire, flood, water damage, power failure, strike, labor dispute, computer breakdown, telephone line disruption, or a natural disaster) prevent or delay the transfer, despite reasonable precautions taken by us

    • The system, ATM or POS terminal was not working properly and you knew about the problem when you started the transaction;
    • The State has not authorized us to make the necessary funds available through the Card;
    • The funds available through the Card are subject to legal process or are otherwise not available for withdrawal; or
    • The transaction cannot be completed because the Card is damaged.

13. **Limitation of Time to Sue.** An action or proceeding by you to enforce an obligation, duty or right arising under these Terms or by law with respect to the Card or the Card service must be commenced within twelve (12) months after the cause of action accrues, unless prohibited by applicable law.

14. **Waiver of Right to Jury Trial.** If you have a problem with the Card or the Card service, please bring it to our attention immediately. In most cases, a telephone call will quickly resolve the problem in a friendly, informal manner. If a dispute cannot be resolved informally, you or we may file an action. You and we each give up the right to a trial by a jury to resolve each dispute, claim, demand, cause of action, and controversy between you and us arising out of, or relating to the Card or this service. This includes, without limitation, claims brought by you as a class representative on behalf of others, and claims by a class representative on your behalf as a class member (so called "class action" suits).

15. **Privacy.** We may obtain nonpublic personal information about you (e.g., your name, address, telephone number, social security number, and date of birth) from the State in order to verify your identity. We do not release personal nonpublic financial information obtained in connection with this Card program about current or former Cardholders to anyone, except: to process a transaction at your request; to the State or its agent in connection with the account that funds Card payments; where it is necessary or helpful in effecting, administering, or enforcing a transaction; to comply with a law, regulation, legal process or court order; to local, state and federal authorities if we believe a crime may have been committed involving a Card; or as otherwise permitted by law. We restrict access to nonpublic personal information about you to those employees who need to know that information to provide products and services to you. We maintain physical, electronic and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

16. **Cardholder Identity.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires that identifying information be obtained for each person who obtains a Card.

17. **Business Days.** Banking business days are Monday through Friday, excluding holidays.

18. **Assignment.** You may not assign your rights or obligations in connection with these Terms, the funds available to you through the Card, or the Card itself to others. We may assign our rights and obligations under these Terms to others without prior notice to you or your consent.

19. **Severability/Waiver.** If any provision of these Terms is deemed unlawful, void, or unenforceable, it will be deemed severed from these Terms and shall not affect the validity and enforceability of the remaining provisions. We may delay enforcing our rights under these Terms without losing them. Any waiver by us will not be deemed a waiver of other rights or of the same right at another time.

20. **Governing Law.** These Terms will be governed by and construed in accordance with the laws of the State of Michigan, without reference to its conflict of law principles.

21. **Legal Process.** We may comply with any subpoena, levy or other legal process which we believe (correctly or otherwise) to be valid. We may notify you of such process by telephone, electronically or in writing. If we are not fully reimbursed for our record research, photocopying and handling costs by the party that served the process, we may charge such costs to your available Card funds, in addition to our legal process fee of $50. We may honor legal process that is served personally, by mail, or by facsimile transmission at any of our offices (including locations other than where the funds, records or property sought is held), even if the law requires personal delivery at a different location.

22. **Change in Terms.** We may add to, delete or change these Terms at any time by providing you with prior notice.

23. **Termination.** We may suspend or terminate your use of the Card with or without cause at any time by providing you with prior notice. We may terminate or suspend your use of our Card and this service immediately if: you breach these Terms or any other agreement with us; we are notified to do so by the State or its agent; we have reason to believe that there has been or may be an unauthorized use of your available Card, Card or PIN; or there are conflicting claims to your available Card funds. You may terminate your use of the Card and these Terms without cause at any time by providing us with prior written notice. You also should notify the State of the termination and make other arrangements for future payments.

24. **FDIC Insured.** The funds associated with the Card are insured by the Federal Deposit Insurance Corporation to the extent provided by law.

ACIDGI01